Nott, J.,
dissenting:
The controlling facts which go to the merits of this case, 1 deem to be these :
In 1870 the claimant cut and furnished to the quartermaster at Fort Brown, under a contract, a quantity of prairie-hay, which was accepted and paid for, and as to which no dispute- *688 arose. In tbe following year tbe claimant again contracted for and furnished a quantity of prairie-bay, wbicb is tbe subject of tbe present dispute. Tbe second quantity of hay was cut on the same prairie, was well cured, and was found by the examining-board wbicb rejected it to be '‘of the same quality as that furnished” by tbe contractor under bis previous contract.
In tbe second contract, tbe one now tbe subject of litigation, tbe only descriptive term used is '•‘good, merchantable prairie hay.” Tbe first question, therefore, wbicb a court should ask is, what was tbe intent of this term “prairie-bay” within tbe meaning of tbe parties when they made tbe contract? Had “prairie-bay” a well-defined commercial significance at tbe time and place of purchase'? Did tbe term by well-established usage relate to bay made of any particular variety of grass'? Was its meaning as well understood in tbe vicinage as “ timothy-hay ” or “clover-bay” would be in a northern market1? If so, it would be a simple matter to determine whether tbe contractor furnished what the term imported, or whether be furnished an article which would not be known as “prairie-bay” in tbe local market.
• A finding of tbe court, and it is to my mind the only finding material to the issue, answers these questions in part by saying “ the term ‘ prairie-bay’ had no commercial signification in Brownsville, and there toas no particular variety of hay Icnoion there by that term.” I cannot, therefore, say when dealing with such a contract that, exvi termini, the contractor agreed to deliver one thing and in fact tendered another. Tbe parties really bargained for a non-mercbantable article by an undefined term. In such a case a court can only ascertain whether the article tendered came within tbe conditions of tbe term used, and then resort to tbe acts or expressions of tbe parties to see whether any further restrictions can be put upon it.
As to the general conditions imported by the term used, it is self-evident that bay made of the grass of a prairie is prairie-bay. If the bay contracted for, notwithstanding tbe generality of tbe term, was to be cut on any particular prairie, or was to be of any particular variety of prairie-grass, tbe burden would be upon the defendants to establish tbe particular essential upon wbicb they rely, and to show that it came fairly within tbe intent of tbe parties, and was as truly an element contracted for as though it bad been written in tbe contract. But, waiv *689 ing this, there are three controlling facts which show beyond a reasonable doubt that the hay tendered by this contractor was the very article contemplated by him and the contracting quartermaster when they entered into their ambiguous agreement. The first of these is that this hay was made on the same prairie from which hay had previously been cut for the Government. The second is that the contract required that the hay furnished should be baled, and this was the only variety of prairie-hay susceptible of being baled. The third is that ^the hay furnished and rejected was of as good quality as that which the preceding year had been bought and sold by the same parties.
The error of construction which, in myjudgment, is now being committed by the decision of the court, consists in looking beyond the meaning of the thing contracted for, and in casting upon the contractor an implied warranty of its utility. The words ‘‘good” and “merchantable,” though they may mean “useful” and “salable,” are always construed in contracts as words of quality and not of kind. If the words of a man’s contract are that he shall purchase a cord of “ good, merchantable sycamore wood,” he cannot show in defense that sycamore is a non-merchantable article, unknown and valueless in the market. Neither can he be permitted to show that sycamore wood is worthless as fuel; nor would the conclusive test avail him anything, that he tried to burn it for four days in his stove and found it practically incombustible. A court would tell him that the obligation imposed by the contract on the other party was not to furnish fuel for his stove, but simply to furnish a specified quantity of sycamore wood, be it useful or worthless. These defendants have been permitted to show that their horses would not eat this hay, though “the mules ate the hay so fed to them, fairly;” and certainly, if mules would eat it “fairly,” oxen would. But the contractor did not agree to furnish forage for horses; and if the obligation were upon him to suppose anything, he may well have supposed that his prairie-hay was intended for mules and oxen. In fact, the more the case is examined, the more clearly it appears that the contracting-agent of the Government purchased an article which the officers at Fort Brown thought they could not use, and that they prudently and in good fajth, but without the slightest reference to the terms of the contract, declined to receive the thing contracted *690 for, because it was a thing which they could put to no practical purpose, and would prove a total loss upon their hands.
A remaining ground of defense is the rejection of this hay by the examining board. The contract contemplated the action of such a board, and the contractor agreed to be bound by its decision. If the board acted upon the contract, and decided that the hay did not fulfill its conditions, there undoubtedly would be the end of the claimant’s case. But no such decision was ever made, either in form.or in substance. The only guide to such a decision necessarily must be the terms 'of the contract. Now, what was the guide enjoiued upon the examining board by the commanding officer who called it into existence and prescribed its duties ? .“The board will be guided in its actions by letter of instruction from the office of chief quartermaster Department of Texas, dated June 2,1871, the requirements of which will he strictly complied, with by the boardP These are the only directions under which the board acted, and which it was bound to obey. Moreover, the officers manifestly thought that while passing upon the utility of the hay, and rejecting it “as being unfit to feed animals,” they were inevitably doing the contractor injustice if his contract were to be taken as his guide; for they are careful to add, “ The board is, however, of the opinion that no good merchantable prairie-hay can be obtained in this vicinity,” meaning, as I understand it, that it would have been impossible for the contractor to furnish horse-forage made from prairie-grass in that vicinity; and they then proceed further and say, “ The hay now submittedis of the same quality as [that] furnished by Mr. Albert Wood [the contractor] under his contract of date December 31, 1869,” showing, as I think, conclusively, that, in the judgment of the board, the hay furnished was the hay contracted for — the only prairie-hay that could have been furnished, and hence the only prairie-hay that could have been contracted for— and that the cause of its rejection was the worthlessness of the kind, and not the inferiority of the quality.
But as in this case our brother, Mr. Justice Bichardson, took part in its decision, and agreed with the majority of the court, and as a postponement till his return would only result in a year’s delay in announcing the decision, I now join with the majority of the court in directing a judgment for the defendants, to the end that if the claimant elects to appeal he may not be delayed in procuring a review by the appellate court.